FILED

2023 Sep-05  AM 09:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

CARISSA RIVERA,       }
                      }
                      }
      Plaintiff,        }
                      }
v.                      }   **Case No.:   2:21-cv-00401-MHH**
                      }
KILOLO KIJAKAZI,     }
**Acting Commissioner of the Social**  }
**Security Administration,**     }
                      }
      Defendant.       }

## <u>MEMORANDUM OPINION</u>

Carissa Rivera has asked the Court to review a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Ms. Rivera's application for disability insurance benefits based on an Administrative Law Judge's finding that Ms. Rivera was not disabled.  Ms. Rivera argues that the Administrative Law Judge—the ALJ—improperly rejected her subjective testimony concerning the frequency and limiting effects of her migraine headaches.  After careful consideration of the administrative record, for the reasons discussed below, the Court remands this matter to the Commissioner for further proceedings.

## ADMINISTRATIVE PROCEEDINGS

To succeed in her administrative proceedings, Ms. Rivera had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [she] is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[1]

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

---

[1] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited Aug. 13, 2023).

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

On June 13, 2019, Ms. Rivera applied for disability insurance benefits. (Doc. 9-4, p. 5). She alleged that her disability began on May 18, 2013. (Doc. 9-4, p. 5). The Commissioner initially denied Ms. Rivera's claim on October 15, 2019. (Doc. 9-6, pp. 2-9). An ALJ held a telephone hearing on July 21, 2020 on Ms. Riverea's application. Ms. Rivera's attorney participated in the telephone hearing, (Doc. 9-4, p. 24), and avocational expert testified at the hearing, (Doc. 9-4, pp. 39-43).

The ALJ issued an unfavorable decision on August 4, 2020. (Doc. 9-4, pp. 2-18). On January 15, 2021, the Appeals Council denied Ms. Rivera's request for review, (Doc. 9-3, pp. 2-5), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g) and § 1383(c).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Ms. Rivera's Medical Records*

To support her application, Ms. Rivera submitted medical records dating to 2010. Ms. Rivera's medical records relate to the diagnoses and treatment of

migraines, celiac disease, gastritis, degenerative disc disease of the lumbar spine, osteoarthritis, fibromyalgia, depression, and anxiety.  The Court has reviewed Ms. Rivera's medical history and summarizes the following medical records because they are the most relevant to Ms. Rivera's arguments in this appeal.

On October 22, 2012, Ms. Rivera saw Dr. Woodrow Herring regarding her migraine headaches.  (Doc. 9-17, pp. 72-73).  Ms. Rivera reported "fairly frequent headaches."  (Doc. 9-17, p. 73).  She stated that she needed a refill of her Imitrex prescription "as it usually help[ed] to abate most of her headaches."  (Doc. 9-17, p. 73).[2]  Dr. Herring noted that Ms. Rivera's migraine headaches were "probably more stress related than anything else."  (Doc. 9-17, p. 72).  Dr. Herring instructed Ms. Rivera to "avoid triggers such as perfumes [and] cigarette smoke."  (Doc. 9-17, p. 72).  Dr. Herring increased Ms. Rivera's prescription for Elavil from 10mg to 20mg and continued her on Imitrex as needed.  (Doc. 9-17, p. 72).[3]

Ms. Rivera sought treatment at Walker Baptist Medical Center emergency department on March 7, 2013 for nausea and vomiting that had persisted for several days.  (Doc. 9-17, p. 47).  Dr. Herring admitted Ms. Rivera to the hospital for "IV

---

[2]  "Imitrex is available as a generic drug called sumatriptan" to treat migraine headaches.  *See* https://www.medicalnewstoday.com/articles/imitrex (last visited Aug. 13, 2023).  Although the record references both Imitrex and sumatriptan, the Court will reference "Imitrex" in this opinion when discussing Ms. Rivera's migraine medication.

[3] "Elavil is an antidepressant medication that has also been used as a preventive treatment for migraine."  *See* https://migraine.com/clinical/elavil-amitriptyline (last visited Aug. 13, 2023).

fluid rehydration and monitoring."  (Doc. 9-17, p. 47).  Dr. Herring noted Ms. Rivera's past medical history of migraine headaches and indicated that she took Imitrex as needed.  (Doc. 9-17, p. 47).

Ms. Rivera returned to Walker Baptish Medical Center emergency department on May 15, 2013 with complaints of nausea, vomiting, fatigue, and dehydration.  (Doc. 9-17, pp. 30-31).  Dr. Herring admitted Ms. Rivera to the hospital for IV fluids.  (Doc. 9-17, p. 32).  Dr. Herring noted Ms. Rivera's history of migraine headaches, anxiety, depression, and celiac disease.  (Doc. 9-17, p. 32).[4] Ms. Rivera returned to the emergency department again on June 23, 2013 with abdominal pain, vomiting, dehydration, and a celiac disease "flare up."  (Doc. 9-17, pp. 43-44).  Dr. Herring admitted Ms. Rivera to the hospital for IV fluids and "IV Protonix and Demerol p.r.n. for migraine headaches" that Ms. Rivera was experiencing.  (Doc. 9-17, p. 44).[5]

On January 30, 2014, Ms. Rivera visited Dr. Luis Franco at Family and Pain Management Specialists for pain in her knees, ankles, feet, shoulders, neck, and

---

[4] Celiac disease is a "chronic digestive and immune disorder that damages the small intestine" and is "triggered by eating foods that contain gluten." *See* https://www.niddk.nih.gov/health-information/digestive-diseases/celiac-disease (last visited September 1, 2023).

[5] Protonix or "Pantoprazole is used to treat certain stomach and esophagus problems (such as acid reflux)."  *See* https://www.webmd.com/drugs/2/drug-20722/protonix-intravenous/details  (last visited July 21, 2023).  "Demerol is a strong prescription pain medicine that is used to manage the relief [of] short-term pain." *See* https://www.drugs.com/demerol.html (last visited July 21, 2023).

lower back.  (Doc. 9-9, p. 101).  She rated her overall pain as 7/10 with her medications.  (Doc. 9-9, p. 101).  Dr. Franco noted Ms. Rivera's history of migraine headaches and listed the diagnoses as diffuse pain, opioid dependence, and chronic pain syndrome.  (Doc. 9-9, pp. 98, 101).  Her medications included oxycodone and carisoprodol.  (Doc. 9-9, p. 98).[6]  Dr. Franco's notes indicated that Ms. Rivera had taken opioids "since 2000."  (Doc. 9-9, p. 101).  Ms. Rivera stated that in the past, "lortab, norco, percocet, [and] methadone" did not help her pain.  (Doc. 9-9, p. 101).  She indicated that she bought prescription drugs "in [the] street" but was "not a drug addict."  (Doc. 9-9, p. 102).  Dr. Franco described Ms. Rivera as an "[i]rritable patient" who talked "relatively loud and fast" and did "not like" Dr. Franco asking questions about her subjective complaints.  (Doc. 9-9, p. 101).

On May 15, 2014, Ms. Rivera sought treatment at UAB Hospital emergency department for suicidal ideations.  (Doc. 9-13, p. 52).  Dr. Whitney McNeil's treatment notes indicated that Ms. Rivera had "[a]ttempted suicide 3 weeks ago" and recently had started the suboxone clinic to help with her opioid dependence. (Doc. 9-13, p. 52).  Ms. Rivera reported that "she d[id] not trust herself with her [life] and that she [would] die anyway she [could]."  (Doc. 9-13, p. 52).  Dr. McNeil noted Ms. Rivera's history of fibromyalgia, celiac disease, and migraines, but Ms.

---

[6]  Carisoprodol is a muscle relaxant for "acute, painful musculoskeletal conditions."  *See* https://www.ncbi.nlm.nih.gov/books/NBK553077/ (last visited July 21, 2023).

Rivera denied a headache and had no "acute medical complaints" on this date. (Doc. 9-13, p. 53). Dr. McNeil ordered a psychiatric consult and admitted Ms. Rivera to the hospital.

On October 12, 2015, Dr. Minh Huynh at Walker Baptist Medical Center emergency department admitted Ms. Rivera to the hospital following a car accident. (Doc. 9-15, p. 7). Ms. Rivera complained of back and leg pain and tenderness but had normal range of motion. (Doc. 9-15, p. 10). On October 26, 2015, Ms. Rivera returned to Walker Baptist emergency department complaining of vomiting, nausea, abdominal pain, and a flare up of her celiac disease. (Doc. 9-15, p. 29). The treatment records for these visits noted Ms. Rivera's past diagnosis of migraines, but Ms. Rivera did not complain of headaches on these dates. (Doc. 9-15, pp. 8, 14, 29).

Ms. Rivera visited Dr. Ivana Kajdos at BHC Walker Family Practice on November 23, 2015 and complained of acute sinus issues, back pain, and migraines. (Doc. 9-16, p. 88). Dr. Kajdos noted that Ms. Rivera's migraine symptoms were "intermittent" and affected her "entire head, occipital, neck and temporal," causing nausea and photophobia. (Doc. 9-16, p. 88). Ms. Rivera reported that anxiety aggravated her migraines, but her prescriptions medications relieved them. (Doc. 9-16, p. 88). She reported dizziness. (Doc. 9-16, p. 90). Ms. Rivera indicated that she had taken Imitrex to help her migraines, and she was "not sure why she was

taken off but want[ed] to have some on hand."  (Doc. 9-16, p. 88).  Dr. Kajdos assessed Ms. Rivera with "[n]onintractable migraine, unspecified migraine type" and prescribed Imitrex for migraine pain.  (Doc. 9-16, p. 92).[7]

On March 31, 2016, Ms. Rivera returned to Walker Baptist Medical Center emergency department complaining of severe abdominal pain.  (Doc. 9-15, p. 47). Attending physician Dr. Pallavi Sunkavalli noted Ms. Rivera's past medical history of migraines.  (Doc. 9-15, p. 48).  Dr. Sunkavalli's "final diagnoses" included "[g]eneralized abdominal pain"; fibromyalgia; celiac disease; "[m]igraine, unspecified, not intractable, without status migrainosus"; anxiety disorder, and "[m]ajor depressive disorder, single episode, unspecified."  (Doc. 9-15, p. 55).[8] During a return visit to the emergency department on April 9, 2016 because of abdominal pain and nausea, the treatment notes again included Ms. Rivera's history of migraines.  (Doc. 9-15, p. 67).  The physical examination indicated Ms. Rivera had "normal range of motion" and normal mood and affect.  (Doc. 9-15, p. 69).  Dr. Sunkavalli discharged Ms. Rivera the same day.

---

[7] Dr. Kajdos also found significant musculoskeletal tenderness and muscle spasm, and he diagnosed fibromyalgia.  (Doc. 9-16, pp. 91-92).

[8] "Status migrainosus is a headache that doesn't respond to usual treatment or lasts longer than 72 hours.  It is a relentless migraine attack that can require medical attention and sometimes a visit to the hospital."  *See*  https://americanmigrainefoundation.org/resource-library/what-is-status-migrainosus/#:~:text=Status%20migrainosus%20is%20a%20headache,pain%20and%20help%20 you%20recover (last visited July 25, 2023).  Therefore, "without" status migrainosus would refer to a migraine that responds to treatment or lasts less than 72 hours.

Later on April 9, Ms. Rivera called an ambulance to transport her to UAB Hospital's emergency department. (Doc. 9-13, p. 47). Ms. Rivera complained of abdominal pain, nausea, and vomiting. (Doc. 9-13, p. 47). Ms. Rivera reported to Dr. Tiffany Jackson that the doctors at Walker Baptist's emergency department "did not do anything for her" that morning, so she "called EMS to bring [her] to UAB." (Doc. 9-13, p. 47). Ms. Rivera denied that she had back pain, a headache, dizziness, numbness, tingling, and weakness. (Doc. 9-13, p. 47). Dr. Jackson noted that Ms. Rivera was "receiving opioid replacement therapy" with suboxone. (Doc. 9-13, p. 48).

Between May 7 and May 25, 2016, Ms. Rivera received chemical dependency and psychiatric illness treatment at The Oaks at La Paloma. (Doc. 9-13, pp. 57, 86). Nurse Practitioner Lynnda Garrett and therapist Darby Walton treated Ms. Rivera. (Doc. 9-13, p. 57). Ms. Rivera reported that she had been using methadone for several months but had "stopped going to the methadone clinic in February 2016 and had been buying it from the street." (Doc. 9-13, p. 86). Ms. Rivera admitted to abusing "Roxycodone 10mg and Xanax 2-6mg daily." (Doc. 9-13, p. 86). Ms. Rivera reported "having anxiety, depression, trauma, and insomnia." (Doc. 9-13, p. 86). Ms. Rivera's diagnoses included substance abuse disorder, major depression, PTSD, borderline personality disorder, celiac disease, fibromyalgia, and migraine headaches. (Doc. 9-13, pp. 70, 79, 82, 87).

The treatment records from The Oaks noted Ms. Rivera's issues with migraines and her use of 100 mg of Imitrex daily as needed for her migraines. (Doc. 9-13, pp. 65, 66, 79, 82, 86, 87, 88, 94).[9]  NP Garrett's notes indicated that Ms. Rivera would "use NSAIDs while [Ms. Rivera was] in [the] treatment facility" to treat her migraines and would "monitor for effectiveness." (Doc. 9-13, p. 70).  At discharge, the treatment notes did not indicate problems controlling Ms. Rivera's migraines with NSAID medications and did not include a prescription for Imitrex in Ms. Rivera's list of discharge medications. (Doc. 9-13, p. 93).

On June 9, 2016, Ms. Rivera returned to Dr. Kajdos at BHC Walker Family Practice regarding her celiac disease, joint pain, and headaches. (Doc. 9-16, p. 52).  Ms. Rivera reported that she took Imitrex as needed for migraine headaches. (Doc. 9-16, p. 48).  Dr. Kajdos renewed Ms. Rivera's prescription for Imitrex 100mg to treat recurrent "[n]onintractable migraine, unspecified migraine type." (Doc. 9-16, p. 54).[10]

---

[9] Imitrex is available in a 25, 50, or 100 milligram tablet.  A patient should not take "more than 200 mg in any 24-hour period."  https://www.mayoclinic.org/drugs-supplements/sumatriptan-oral-route/proper-use/drg-20074356   (last   visited   Sept.   1,   2023);   *see   also* https://gskpro.com/content/dam/global/hcpportal/en_US/Prescribing_Information/Imitrex_Tablets/pdf/IMITREX-TABLETS-PI-PIL.PDF (last visited Sept. 1, 2023).

[10] A nonintractable migraine lasts usually up to 72 hours and can be treated with migraine medications.  An "intractable migraine" lasts over 72 hours and is "notoriously difficult to relieve with standard migraine treatments." *See* https://axonoptics.com/blogs/post/intractable-migraine-definitive-guide (last visited July 26, 2023).

Ms. Rivera saw Dr. McLain on February 2, 2017 and complained of leg, back, and shoulder pain that Ms. Rivera rated at a 7/10 on the pain scale. (Doc. 9-16, pp. 126, 131). Dr. McLain noted that Ms. Rivera's "left shoulder [was] flared up," but she was "doing well" with a low dose of naltrexone. (Doc. 9-16, p. 131). Dr. McLain injected triamcinolone into Ms. Rivera's left shoulder to treat the inflammation. (Doc. 9-16, p. 130). Ms. Rivera reported that she had no headache during this visit; that Dr. Kajdos had diagnosed her with anemia; that Dr. McLane had diagnosed her with bipolar disorder; and that she was taking lithium, Abilify, and gabapentin. (Doc. 9-16, p. 126). Ms. Rivera indicated that her anxiety was "better" and that she had "some depression on some days." (Doc. 9-16, p. 126).

Ms. Rivera returned to her psychiatrist, Dr. McLane, on February 7, 2017 and March 7, 2017. At a February 7 visit, Ms. Rivera reported that she was pleased with her medications but that her sleep was "worse." (Doc. 9-16, p. 162). For both visits, Dr. McLane noted that Ms. Rivera had fair judgment and insight, normal thought organization, appropriate mood and affect, and "intact" capacity for her activities of daily living. (Doc. 9-16, pp. 163, 166). Dr. McLane's diagnosis during both visits included "[m]igraines." (Doc. 9-16, pp. 164, 167).

Ms. Rivera visited Dr. Luis Davila at Gastroenterologists Consultants of Jasper on March 29, 2017 for severe abdominal pain and esophagitis. (Doc. 9-14, p. 102). Ms. Rivera did not complain of a migraine at this appointment, but Dr.

Davila noted in the "Assessment" section that Ms. Rivera had "[m]igraine, unspecified, not intractable, without status migrainosus." (Doc. 9-14, p. 103). Dr. Davila's notes include the same assessment for a follow up appointment on April 12, 2017. (Doc. 9-14, p. 100).

On June 15, 2017, Ms. Rivera returned to Dr. Kajdos for her migraine headaches. (Doc. 9-16, p. 56). Dr. Kajdos rated the severity of Ms. Rivera's recurring migraines as "moderate." (Doc. 9-16, p. 56). Ms. Rivera reported that her migraines caused pain at a "0/10" on the pain scale. (Doc. 9-16, pp. 56, 60). Ms. Rivera reported that her anxiety and certain foods aggravated her migraines, but her medication controlled her migraines. (Doc. 9-16, pp. 56-57). Ms. Rivera was prescribed Imitrex in 100mg doses to be taken "as early as possible after the onset of a migraine[;] may repeat in 2hrs one time." (Doc. 9-16, p. 57).

Mr. Rivera returned to Dr. McLain on November 22, 2017 and complained of severe muscle pain in both shoulders that radiated to her back. (Doc. 9-16, p. 118). She stated that she had numbness in her legs from the knees down and in her "hands from the elbows down." (Doc. 9-16, p. 119). Ms. Rivera reported that lifting, moving, pushing, walking, standing, sweeping, and mopping aggravated her pain, but medications relieved her pain. (Doc. 9-16, p. 118). She indicated that her symptoms included decreased mobility, difficulty sleeping, limping, popping, and tingling in her arms and legs. (Doc. 9-16, p. 118). Ms. Rivera reported that her

fibromyalgia symptoms included a reduction in daily activities, "tender points," joint pain, and muscle spasms.  (Doc. 9-16, p. 118).  She also reported at this visit that she had no headache, no joint swelling, and no "morning stiffness and back pain."  (Doc. 9-16, p. 118).

Dr. McLain's physical examination of Ms. Rivera during the November 17 visit revealed that Ms. Rivera had a normal range of motion in all extremities and two tender joints in her left shoulder.  (Doc. 9-16, pp. 122, 123).  Dr. McLain noted that Mr. Rivera had "16 out of 18 total tender points" in the "soft tissue" in her neck, shoulders, chest, back, and legs.  (Doc. 9-16, p. 122).

On December 28, 2017, Ms. Rivera returned to Dr. Kajdos seeking treatment for chronic conditions including her "[n]onintractable migraines."  (Doc. 9-16, p. 75).  Dr. Kajdos opined that Ms. Rivera's migraines were chronic.  (Doc. 9-16, p. 78).  Dr. Kajdos continued Ms. Rivera's Imitrex prescription for her migraines. (Doc. 9-16, p. 79).

On January 10, 2018, Ms. Rivera visited Nurse Practitioner India Berryhill at Urgent Care Northwest.  (Doc. 9-16, p. 20).  Ms. Rivera sought treatment for frequent nausea, vomiting, and right shoulder pain.  (Doc. 9-16, p. 22).  NP Berryhill noted that Ms. Rivera reported "no migraines, no headaches."  (Doc. 9-16, p. 22).

Ms. Rivera sought treatment on March 6, 2018 at Walker Baptist Medical Center emergency department for severe abdominal pain, nausea, and vomiting.

(Doc. 9-15, p. 74).  Ms. Rivera indicated that she was 10 weeks pregnant and had not been to her OB/GYN and that she was a recovering addict who had been clean for two years.  (Doc. 9-15, p. 74).  Physician Assistant Anna Henderson's physical examination of Ms. Rivera indicated a normal range of motion in her neck and musculoskeletal system, normal mood and affect, and normal judgment and thought.  (Doc. 9-15, pp. 76-77).  Ms. Rivera's past medical history for this visit included migraines, but Ms. Rivera did not complain of a migraine during this visit. (Doc. 9-15, p. 75).

During her pregnancy between March 21 and August 29, 2018, Ms. Rivera had four tele-medicine visits for mental health treatment with CRNP Rachel Meadows in Dr. McLane's office.  At a March 21 visit, Ms. Rivera reported that she stopped all medications, including Imitrex for migraines, on February 28, 2018 because of her pregnancy.  (Doc. 9-16, p. 168).  She indicated that her anxiety was "high," and CRNP Meadows prescribed BuSpar 7.5 mg for her anxiety.  (Doc. 9-16, p. 168).  By an April 18 visit, Ms. Rivera reported that her anxiety was "better," but she had been a "little depressed."  (Doc. 9-16, p. 171).  CRNP Meadows increased her BuSpar to 10 mg.  (Doc. 9-16, p. 171).  The diagnosis at each of these visits included "[m]igraines," although the notes did not indicate that Ms. Rivera complained of a migraine during these visits.  (Doc. 9-16, p. 170, 173, 176, 179).

After Ms. Rivera had her baby, she had a tele-medicine visit with CRNP Meadows on November 21, 2018.  (Doc. 9-16, p. 180).  CRNP Meadows restarted Ms. Rivera on Paxil and Vistaril for her anxiety.  (Doc. 9-16, p. 180).  Ms. Rivera reported that her depression was "a lot better," her anxiety was "better," and she could "interact socially better."  (Doc. 9-16, p. 180).  By a February 6, 2019 tele-medicine visit, Ms. Rivera reported that her anxiety and depression had increased, and CRNP Meadows increased Ms. Rivera's Paxil to 30 mg.  (Doc. 9-16, p. 183). The diagnosis for these visits included "[m]igraines," but CRNP Meadow's notes do not indicate that Ms. Rivera complained of migraines during these visits.  (Doc. 9-16, pp. 182, 185).

Ms. Rivera visited Dr. McGee at Urgent Care Northwest on December 23, 2018.  (Doc. 9-16, p. 3).  Ms. Rivera complained of sinus problems, sore throat, and cough.  (Doc. 9-16, p. 5).  Ms. Rivera's medical history in the treatment notes included migraines, with an onset date of "2/27/2018."  (Doc. 9-16, pp. 4, 5, 10, 12).[11]  The list of medications included Ms. Rivera's prescription for Imitrex for her migraines.  (Doc. 9-16, pp. 3, 10).

On January 3, 2019, Ms. Rivera visited Dr. Angela Blount at ENT Associations of Alabama and complained of sinus and allergy issues.  (Doc. 9-16,

_____

[11] Every condition listed in Ms. Rivera's medical history for this visit, even those for which she had sought treatment prior to the February 27, 2018, reflected an identical onset date.  (Doc. 9-16, p. 4).

pp. 46-47).  Ms. Rivera reported that she had "had a baby" and had to stop her allergy medications during her pregnancy.  (Doc. 9-16, p. 47).  Dr. Blount noted Ms. Rivera's past medical history of migraine headaches, and her medication list included Imitrex for migraines.  (Doc. 9-16, p. 47).  Ms. Rivera reported that she had lately been in general good health.  (Doc. 9-16, p. 47).

Ms. Rivera returned to Dr. Kajdos on January 28, 2019 after a "year long break from visits due to [Ms. Rivera's] pregnancy."  (Doc. 9-16, p. 62).  Dr. Kajdos's diagnosis included "[n]onintractable migraine, unspecified migraine type" that Ms. Rivera treated with Imitrex.  (Doc. 9-16, p. 64).  Dr. Kajdos also noted that Ms. Rivera would "check if [insurance] would pay [for] Aimovig shots[.]"  (Doc. 9-16, p. 64).[12]  At an April 15, 2019 appointment, Dr. Kajdos noted that Ms. Rivera's migraines were "still frequent and severe."  (Doc. 9-16, p. 67).  Dr. Kajdos prescribed Aimovig injections every 30 days and ferrous sulfate to help Ms. Rivera with her migraines.  (Doc. 9-16, pp. 67, 73).[13]

During tele-medicine visits on March 6 and April 3, 2019, Ms. Rivera reported to CRNP Meadows that her anxiety, depression, and panic attacks had increased.  (Doc. 9-16, p. 186).  CRNP Meadows increased Ms. Rivera's Paxil to

---

[12] Aimovig is a "subcutaneous auto-injector migraine prevention medication[]."  *See* https://www.webmd.com/drugs/2/drug-175274/aimovig-autoinjector-subcutaneous/details  (last visited July 26, 2023).

[13] "[F]errous sulfate can be used as a safe and effective drug in migraine prophylaxis."  *See* https://pubmed.ncbi.nlm.nih.gov/27222700/ (last visited August 8, 2023).

40 mg, weened her off Vistaril, and prescribed Inderal 10 mg for anxiety.  (Doc. 9-16, p. 186).  Although CRNP Meadow's diagnosis during these visits included "[m]igraines," the notes for these visits do not indicate that Ms. Rivera complained of migraines.  (Doc. 9-16, pp. 188, 191).  CRNP Meadows noted that Ms. Rivera's activities of daily living were "intact."  (Doc. 9-16, p. 187).

Ms. Rivera saw CRNP Mary Martin at Jasper Urology Associates on April 24, 2019 regarding incontinence issues.  (Doc. 9-16, pp. 96-97).  Ms. Rivera was "[n]egative" for headaches and depression.  (Doc. 9-16, p. 100).

During a May 14, 2019 visit with Dr. McLain, Ms. Rivera complained of severe shoulder pain.  (Doc. 9-16, p. 112).  Ms. Rivera reported that her celiac disease was controlled with a gluten-free diet and that her fibromyalgia symptoms were "mild" and "stable."  (Doc. 9016, p. 112).  She indicated that she had "postpartum depression" but saw a therapist and psychiatrist.  (Doc. 9-16, p. 113). Dr. McLain's notes indicated that Ms. Rivera was "[p]ositive" for a headache and for joint pain, myalgia, and widespread muscle pain.  (Doc. 9-16, p. 114).  Dr. McLain's physical examination of Ms. Rivera revealed "16 out of 18 total tender points" in her neck, shoulders, chest, back, and legs and full range of motion in her shoulder, arms, legs, and hips.  (Doc. 9-16, p. 115).

On May 16 and 30, 2019, Ms. Rivera's therapist Connie Oden noted in her treatment plans that Ms. Rivera had attempted suicide by overdosing on "March 19" and went to the "BMU." (Doc. 9-16, pp. 213, 216).[14]

At a November 6, 2019 visit with Dr. Kajdos, Ms. Rivera reported that she had "marked improvement" in her migraines "with Aimovig." (Doc. 9-18, p. 80). At a November 20, 2019 follow up with CRNP Stacie Bullock at BBH Urology Associates of Jasper, Ms. Rivera reported that she was "negative" for headaches and depression; had normal mood, affect, and judgment; and had normal range of motion in her neck and "musculoskeletal" system. (Doc. 9-17, p. 108).

On February 6, 2020, Ms. Rivera saw Dr. Kajdos and reported that she was "[p]ositive for headaches" but that Aimovig helped her migraines improve. (Doc. 9-18, pp. 96-97). At the June 16, 2020 visit, Ms. Rivera reported that she was positive for a headache, and Dr. Kajdos's diagnosis included "[n]onintractable migraine, unspecified migraine type" that was unresolved. (Doc. 9-18, p. 101). Dr. Kajdos continued Ms. Rivera on the Aimovig shots every 30 days for her migraines. (Doc. 9-18, p. 107).

At an April 29, 2020 follow up with Dr. McLain, Ms. Rivera reported that she had pain in her shoulders but "other than this she [was] doing well." (Doc. 9-

---

[14] The Court cannot find medical records for this March 19 episode.

18, p. 4).  Dr. McLain noted that Ms. Rivera was "[p]ositive" for a headache and that her fibromyalgia was "mild" and "stable."  (Doc. 9-18, pp. 3, 5).

*Ms. Rivera's Administrative Hearing*

The ALJ held Ms. Rivera's administrative hearing via telephone on July 21, 2020.  (Doc. 9-4, pp. 24-44).  Ms. Rivera testified that she lived with her ex-husband and three children ages 20 months, 10, and 16.  (Doc. 9-4, p. 37).  She stated that she was in a custody battle with her ex-husband over her 20-month-old son.  (Doc. 9-4, p. 38).

Ms. Rivera testified that she stopped working as a paralegal in 2013 because of her hospitalizations for celiac disease.  (Doc. 9-4, p. 28).  She stated that "a week prior to . . . losing [her] job, [she] was hospitalized with gastritis" and that the "last time [she] was hospitalized for gastritis was back in 2015."  (Doc. 9-4, pp. 28-29).  Ms. Rivera testified that the last time she was hospitalized overall was in 2018 in a psychiatric facility for an overdose of sleeping pills.  (Doc. 9-4, p. 29).[15]  She stated that she suffered postpartum depression "real[ly] bad" that led to the overdose.  (Doc. 9-4, pp. 29-30).

---

[15]  The Court cannot find records of a hospitalization in 2018 for an overdose.  The only mention that the Court could find of an attempted overdose after Ms. Rivera's pregnancy was in her therapist's May 2019 notes regarding a March 19, 2019 attempted overdose.  (Doc. 9-16, pp. 213, 216).

Ms. Rivera testified about her previous addiction to "pain pills" and her treatment at The Oak at La Paloma. (Doc. 9-4, p. 30). She stated that she had been "free from pain pills and benzos" for five years but admitted that she had smoked marijuana six months earlier. (Doc. 9-4, p. 31).

Regarding her migraines, Ms. Rivera testified that "[she did not] -- migraines that often, but when [she did] get them," she had "sensitivity to the light, sound, and smell." (Doc. 9-4, p. 31). She testified that she suffered from migraines "at least five or six times a night." (Doc. 9-4, p. 31).

Ms. Rivera testified that she had pain in her shoulders, hips, and lower back that "radiate[d] down to both of [her] legs." (Doc. 9-4, pp. 32-34). She stated that she had pain at an 8/10 on the pain scale every day. (Doc. 9-4, p. 32). She testified that she could stand "maybe an hour" and would have to sit down because of pain in her back and legs. (Doc. 9-4, p. 35). Ms. Rivera testified that she could walk from her house to her mailbox and could sit for a "few minutes" before her hips bothered her and she would have to stand or walk around. (Doc. 9-4, p. 36).

Regarding her mental health, Ms. Rivera testified that she saw a "social worker" and psychiatrist who treated her with "Geodon" for her anxiety and "Strattera for ADHD." (Doc. 9-4, p. 34). She stated that she had suicidal ideations "last year," but she "talk[ed] it out when [she] start[ed] having the suicidal thoughts." (Doc. 9-4, pp. 34-35). She stated that she had "four to five bad days a

week" when her "[m]ental health and [her] anxiety [went] through the roof." (Doc. 9-4, p. 36).

Ms. Rivera testified about her activities of daily living. She stated that she loaded the dishwasher, washed a few dishes by hand, cooked "small, easy meals" that took no longer than 30 minutes to prepare, and drove to the grocery store twice a week. (Doc. 9-4, p. 37). Ms. Rivera testified that she could not vacuum, sweep, or mop. (Doc. 9-4, p. 37). She stated that she changed her 20-month-old son's diapers, fed, and bathed him; cooked for her children; dropped off and picked up her children from activities; and drove her children to their doctor appointments. (Doc. 9-4, pp. 38-39).

John Long testified as a vocational expert. (Doc. 9-4, pp. 39-43). Mr. Long classified Ms. Rivera's past relevant work as a paralegal as light, skilled work. (Doc. 9-4, p. 40). The ALJ posed this hypothetical to Mr. Long:

> Consider a hypothetical individual that has the claimant's age, education, and work experience; this hypothetical person will have the following limitations: light exertion level; frequent ramps and stairs; never climbing ladders, ropes, or scaffolding; frequent balance[,] stoop[,] and kneel; occasional crouch and crawl; must avoid concentrated exposure to extreme cold and heat, bright industrial lighting, vibrations, general workplace hazards; never around unprotected heights and never dangerous equipment or machinery; never operation of a motor vehicle as a work requirement and in a work environment that should be no louder than a moderate noise level; this person can perform simple goal-oriented tasks that are not production-rate pace or fast-paced daily quotas; they can understand and follow simple, routine, [written] instructions; they can make simple, routine decisions; they can have

> work-related contact, frequent with supervisors, occasional with
> coworkers and the general public; they can tolerate frequent
> changes in the workplace setting.

(Doc. 9-4, p. 41). Mr. Long testified that this individual could not perform Ms.

Rivera's past work as a paralegal but could perform unskilled, light exertional work

as a garment sorter, with approximately 50,000 jobs available in the national

economy, and a ticketer, with approximately 75,000 jobs available in the national

economy. (Doc. 9-4, p. 41).[16]

Mr. Long testified that an employer would not tolerate an employee being off

task more than 10% of the time in addition to "usual and customary breaks." (Doc.

9-4, p. 42). Mr. Long also stated that no work would be available for an individual

who "was unable to sit, stand, or walk for a total of eight hours" in a workday.

(Doc. 9-4, p. 42).

## THE ALJ'S DECISION

Following the hearing, the ALJ issued an unfavorable decision. (Doc. 9-4,

pp. 5-18). The ALJ found that Ms. Rivera had not engaged in substantial gainful

activity since May 18, 2013, the alleged onset date, through her date last insured of

---

[16] The transcript from the administrative hearing is unclear and does not specifically include the
garment sorter job. The transcript states: "Yes, sir. Okay. This is light; unskilled with an SVP
of 2; that is 222.687-014; there'd be at least 50,000 of those jobs in the national economy." (Doc.
9-4, p. 41). The vocational expert did not state to which job "this" referred. The ALJ stated in
his decision that the vocational expert testified that the hypothetical person could work as a
"[g]arment sorter, DOT Code 222.687-014, light, SVP 2, with approximately 50,000 jobs existing
in the nation." (Doc. 9-4, p. 17).

December 31, 2018.  (Doc. 9-4, p. 7).[17]  The ALJ determined that Ms. Rivera was suffering from the severe impairments of celiac disease/gastritis, degenerative disc disease of the lumbar spine, osteoarthritis, migraines, depression, and anxiety. (Doc. 9-4, p. 8).  The ALJ found that Ms. Rivera's fibromyalgia was not a medically determinable impairment.  (Doc. 9-4, p. 10).  Based on a review of the medical evidence, the ALJ concluded that Ms. Rivera did not have an impairment or a combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P Appendix 1.  (Doc. 11-3, p. 22).

Considering Ms. Rivera's impairments, the ALJ evaluated Ms. Rivera's residual functional capacity.  The ALJ determined that Ms. Rivera had the RFC to perform:

> light work as defined in 20 CFR 404.1567(b) except frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds; frequently balance, stoop, and kneel, but occasionally crouch and crawl; avoid concentrated exposure to extreme cold and heat, bright industrial lighting (brighter than fluorescent) (can wear tinted safety glasses as needed), vibrations, and general workplace hazards; never work at unprotected heights; never work with or near dangerous equipment/machinery; never operate a motor vehicle as a work requirement; and a work environment that is no louder than a moderate noise level. The claimant can perform simple goal oriented tasks; no production rate pace or fast paced daily quotas; can understand and follow simple routine rote instructions; can make simple routine decisions; can have frequent contact with supervisors and occasional contact with co-workers-public; and can tolerate frequent changes to the work place setting.

---

[17]  A claimant is eligible for disability insurance benefits if she had a disability on or before the date last insured.  *See* 42 U.S.C. §§ 416(i)(3), 423(a)(1)(A).

(Doc. 9-4, pp. 12-13).  Based on this RFC, the ALJ concluded that Ms. Rivera could not perform her past relevant work as a paralegal.  (Doc. 9-4, p. 16).  Relying on testimony from the VE, the ALJ found that jobs existed in the national economy that Ms. Rivera could perform, including work as a garment sorter and ticketer.  (Doc. 9-4, p. 17).  Accordingly, the ALJ determined that Ms. Rivera was not under a disability as defined by the Social Security Act.  (Doc. 9-4, p. 18).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether substantial evidence in the record supports the ALJ's findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If the ALJ's decision is supported by substantial

evidence, then the district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Ms. Rivera argues that the ALJ improperly discounted her testimony about the frequency of her migraine headaches and their limiting effects on her ability to work. (Doc. 13, p. 14). Because the record concerning the frequency of Ms. Rivera's migraines is unclear, the Court cannot determine whether substantial evidence supports the ALJ's findings regarding this issue.

The transcript of Ms. Rivera's testimony about her migraines reads:

> Q   Okay. There was an issue with migraines. Tell me about your migraines.
>
> A   I have sensitivity to light, sound, smell, migraines, but they're –
>
> Q   Okay. Bad as they used to be?

> A   Huh-uh. I don't – migraines that often, but when I do get them, I still [sic] the sensitivity to the light, sound, and smell.
>
> Q   How often –
>
> A   It's at least five or six times a night.

(Doc. 9-4, p. 31).  Although the transcript omitted several words, the transcript suggests that Ms. Rivera did not "have" migraines that often but experienced sensitivity to light, sound, and smell when she suffered from a migraine.  Ms. Rivera's testimony that she had migraines "at least five or six times a night" seems like a misstatement or a typographical error.  (*See* Doc. 9-4, p. 31).  Perhaps Ms. Rivera testified that she suffered from migraines five or six times a month or perhaps she used the word "night" but misspoke.  To review the ALJ's decision, the Court cannot speculate as to the proper interpretation of this section of the hearing transcript.

To confuse matters further, the ALJ wrote that Ms. Rivera "alleged 4-5 migraines a day," (Doc. 9-4, p. 8), but later noted that Ms. Rivera "allege[d] migraines 4-5 days a week," (Doc. 9-4, p. 14).  The Court cannot locate in the hearing transcript testimony regarding "4-5 migraines" a day or a week.

The Court cannot determine the accuracy of the transcript testimony or the information that the ALJ considered concerning the frequency of Ms. Rivera's migraines.  Because the record before the Court is unclear regarding the frequency of Ms. Rivera's migraines, the Court cannot determine whether substantial evidence

supports the ALJ's findings on this issue.  Therefore, remand is appropriate to clear up these inconsistencies in the ALJ's decision and Ms. Rivera's testimony.  *See Steeples v. Saul*, 450 F. Supp. 3d 1274, 1289-90 (N.D. Ala. 2020) (finding that the record was unclear regarding the disability onset date and remanding because the Court could not determine whether substantial evidence supported the ALJ's onset date finding).  On remand, the ALJ should develop on the record the frequency, duration, and functional limitations caused by Ms. Rivera's migraines, including how many days each month Ms. Rivera would miss work because of her migraines.

The Court notes that at step two, Social Security Ruling 19-4P requires an ALJ to consider objective medical evidence from an acceptable medical source to determine whether a primary headache disorder, like a migraine, is a medically determinable impairment.  SSR 19-4P, 2019 WL 4169635, *5-6 (2019).  SSR 19-4P prevents an ALJ from "establish[ing] the existence of a[] [medically determinable impairment] based only on a diagnosis or a statement of symptoms" of a primary headache disorder.  SSR 19-4P at *6; *see Sellers v. Soc. Sec. Admin., Comm'r*, No. 7:20-CV-01748-SGC, 2022 WL 4476731, at *4 (N.D. Ala. Sept. 26, 2022).  Instead, the ALJ must consider a combination of medical findings from an AMS to establish a primary headache disorder as a medically determinable impairment:

- A primary headache disorder diagnosis from an acceptable medical source.  "The evidence must document that the AMS who made the

diagnosis reviewed the person's medical history, conducted a physical examination, and made the diagnosis only after excluding alternative medical and psychiatric causes of the person's symptoms.   In addition, the treatment notes must be consistent with the diagnosis.

- An observation of a typical headache event, and a detailed description of the event including all associated phenomena, by an AMS.

- Remarkable or unremarkable findings on laboratory tests.

- Response to treatment. The adjudicator will consider whether a person's headache symptoms have improved, worsened, or remained stable despite treatment and consider medical opinions related to a person's physical strength and functional abilities. When evidence from an AMS documents ongoing headaches that persist despite treatment, such findings may constitute medical signs that help establish the presence of an MDI.

*Sellers v. Soc. Sec. Admin., Comm'r*, No. 7:20-CV-01748-SGC, 2022 WL 4476731, at *4 (N.D. Ala. Sept. 26, 2022) (citing SSR 19-4P).

Here, the ALJ acknowledged that Ms. Rivera's medical records showed "a diagnosis of migraine headaches throughout the evidence," (Doc. 9-4, p. 8), but the ALJ stated that Ms. Rivera's "health providers did not provide evidence that alternative medical and psychiatric causes of [her migraines] were excluded and did not note any specific consideration of each of [her] other medically determinable impairments."  (Doc. 9-4, p. 9). The ALJ suggested that Ms. Rivera's migraines were not a medically determinable impairment under step two, but the ALJ concluded that he accepted the "findings and diagnoses which reflect [that Ms.

Rivera had] head discomfort" and found Ms. Rivera's migraines to be a severe impairment. (Doc. 9-4, p. 9). On remand, the ALJ should clarify this finding.[18]

On remand, the ALJ should examine not only the evidence concerning Ms. Rivera's migraine headaches but also the evidence regarding Ms. Rivera's fibromyalgia. At step two, the ALJ found that Ms. Rivera's fibromyalgia was not a medically determinable impairment. (Doc. 9-4, p. 10).[19] In evaluating Ms. Rivera's fibromyalgia, the ALJ recounted SSR 12-2p and the factors necessary to establish fibromyalgia as a medically determinable impairment. (Doc. 9-4, p. 10). The ALJ found that Ms. Rivera's "physical examinations fail[ed] to show the . . . requisite number and/or locations of tender-points" as required by 1990 ACR Criteria for the Classification of Fibromyalgia. (Doc. 9-4, p. 10); *see* SSR 12-2p (requiring a history of widespread pain, "at least 11 positive tender points on physical examination," and evidence that "other disorders that could cause the

---

[18] The Court also is confused by the ALJ's statement that "[t]here is a diagnosis of migraine headaches throughout the evidence," followed by the statement that Ms. Rivera's "treatment notes show an assessment of migraines was mentioned on occasion (Exhibits 13F, 19F, and 32F)." (Doc. 9-4, p. 8). The discussion of Ms. Rivera's medical records in this opinion is difficult to reconcile with the proposition that Ms. Rivera's "treatment notes show an assessment of migraines was mentioned on occasion (Exhibits 13F, 19F, and 32F)." The Court notes that Ms. Rivera was prescribed the highest possible dosage of Imitrex tablets until her physician transitioned her to monthly injections for her migraine headaches.

[19] The ALJ stated that even if Ms. Rivera's fibromyalgia was a medically determinable impairment, her fibromyalgia was "mild," (Doc. 9-4, p. 10), but because the ALJ found that Ms. Rivera's fibromyalgia was not a medically determinable impairment, he did not consider her fibromyalgia in determining her RFC. (*See* 9-4, pp. 13-16).

symptoms or signs were excluded" for fibromyalgia to constitute a medically determinable impairment).

The ALJ's statement that the record does not contain evidence of the requisite number of tender points to make a finding as to fibromyalgia is mistaken. Dr. McLain's physical examinations of Ms. Rivera in November 2017 and May 2019 revealed that she had "16 out of 18 total tender points" in the "soft tissue" in her neck, shoulders, chest, back, and legs. (Doc. 9-16, pp. 115, 122). On remand, the ALJ should consider these tender point findings in the medical record and consider whether a consultative examination is warranted to assess whether Ms. Rivera's fibromyalgia is a medically determinable impairment that the ALJ should consider.

## CONCLUSION

For the reasons discussed above, the Court cannot determine whether substantial evidence supports the ALJ's decision. Accordingly, the Court reverses the decision of the Commissioner and remands this case for further proceedings consistent with this opinion.

**DONE** and **ORDERED** this September 5, 2023.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE